1                   UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF MISSISSIPPI
2                        NORTHERN DIVISION

3

4    UNITED STATES OF AMERICA

5         vs.                   Criminal Action No. 3:18CR114-HTW-FKB

6

7    DEVON MODACURE

8

9

10      COURT REPORTER'S TRANSCRIPT OF TESTIMONY OF MICHAEL PARTEN

11
                    BEFORE HONORABLE HENRY T. WINGATE
12              UNITED STATES DISTRICT COURT JUDGE

13                        August 6, 2018
                        Jackson, Mississippi
14

15

16   APPEARANCES:

17   MR. ABE MCGLOTHIN
     Assistant United States Attorney
18
          Representing the Government,
19        United States of America

20

     MR. DENNIS SWEET
21   Attorney at Law

22        Representing the Defendant,
          Devon Modacure
23

24   COURT REPORTER:
     Brenda D. Wolverton, RPR, CRR, FCRR
25   Jackson, Mississippi

1      **MICHAEL PARTEN**,

2  having first been duly sworn, testified as follows:

3      **CROSS-EXAMINATION**

4  BY MR. SWEET:

5  Q    State your name for us.

6  A    Special Agent Michael Parten, P-A-R-T-E-N.

7  Q    Agent Parten, are you assigned to the Modacure case?

8  A    Yes, sir.

9  Q    All right.  And in your investigation of the Modacure case,

10  you obtained statements in connection with this investigation?

11  A    I have got a statement from one of the officers.

12  Q    And what officers do you have a statement from?

13  A    Officer Short.

14  Q    Officer Short is not one of the two persons -- I showed you

15  a video of him running?

16  A    Uh-huh.

17  Q    He is not one of the two persons?

18  A    He is.

19  Q    Which one is he?  Is he one of the ones who did the

20  shooting?

21  A    Yes, sir.

22  Q    Was he the first one or the second one?

23  A    Second one.

24      MR. SWEET:  May I see the statement, please, Your

25  Honor?

1       (SHORT PAUSE)

2    BY MR. SWEET:

3    Q    Just so I understand, the statement you have is a statement

4    of another officer who interviewed Short and has what Short

5    says occurred.

6    A    That was from the previous court appearance we had.  I was

7    reviewing Jackson Police Department reports regarding that

8    event.

9    Q    Is that report there Officer Short's report?

10   A    This is me speaking to Officer Short this past Friday.

11   Q    Speaking to who?

12   A    Officer Short.

13   Q    Okay.  So you went and the interviewed Short last Friday?

14   A    Yes, sir.

15   Q    And you also went to the scene?

16   A    I did.

17   Q    When did you go to the scene?

18   A    Friday.

19   Q    All right.  Now, you went and looked at this carport?

20   A    Correct.

21   Q    You saw the two video cameras up?

22   A    Three.  Two in the carport and one on the corner of the

23   house.

24   Q    And you attempted to interview the individuals at that

25   house?

1    A    I spoke to the man, I believe his name is Mr. Graham.   He

2    advised he was at the house during the shooting but did not see

3    anything.

4    Q    Okay.   He told you he didn't see anything.   Did you

5    interview anyone else?

6    A    No, sir.

7    Q    Was anyone -- the owner of the house was not there?

8    A    There was a Mrs. Fleming, his girlfriend, and I am not sure

9    she is the owner, but he said that she is the one that dealt

10   with you regarding the video I think.

11   Q    She is the one who had the hard drive and all containing

12   the video?

13   A    Yes.

14   Q    You all left a number for her to contact you?

15   A    Yes.

16   Q    Has she contacted you?

17   A    No.

18   Q    Now, you understood then after I showed you a video there

19   was a video, in fact, of the shooting?

20   A    I understand that when you showed it to me the first time.

21   Q    Prior to that, you had no knowledge of it?

22   A    No, sir.

23   Q    Any investigation you had no knowledge of the video?

24   A    No, sir.

25   Q    Now, and at the last hearing, you saw it for the first

1   time?

2   A    Yes, sir.

3   Q    Now, I believe Officer Short stated -- well, the previous

4   police reports you reviewed said that Mr. Modacure ran from

5   over off Memphis Street?

6   A    That's what it said, but that's not accurate.

7   Q    All right.  Go ahead and explain to me that's what he said

8   but that's not accurate.

9   A    The officers, Sergeant Hampton, Officers Cody, Smith and

10  Officer Short, they encountered Mr. Modacure at 3423 Fontaine

11  Avenue, and while speaking to him, they said they were going to

12  pat him down for weapons, and he ran towards Memphis Street.

13  Q    You said before, but it wasn't -- tell me what you said

14  before that was not correct.

15  A    Some addresses are kind of blended or mistransposed.  All

16  locations reference Fontaine, Lampton and Memphis, but the

17  street numbers or the sequence at which those addresses were

18  relevant for that day of the shooting are not completely

19  accurate the way it's written in the report.

20  Q    All right.

21  A    Reports.

22  Q    Well, one report said when they approached Mr. Modacure

23  that he drew a weapon on them.

24  A    I haven't seen that in the report.

25  Q    You haven't seen that?

```
 1  A    No.   Which report?  I have got all the reports.  Which one
 2  is that it?
 3  Q    I just got them all.  That's not correct, though?
 4  A    No, it's not.
 5  Q    It's not correct?
 6  A    No, sir.
 7            THE COURT:  What's not correct?
 8            THE WITNESS:  When the officers approached
 9  Mr. Modacure, he did not draw a weapon on the officers.  He had
10  one on his person in his waistband, but he did not draw it
11  until he started running away from the officers.
12  BY MR. SWEET:
13  Q    I'm going to show you the crime scene report.
14            MR. SWEET:  May I approach, Your Honor?
15            THE COURT:  You may.
16  BY MR. SWEET:
17  Q    This is the crime scene report.  Do you have that?
18  A    I do.
19  Q    Read the bottom.  Officer Johnson advised as Officer Short
20  and Smith approached Mr. Modacure he displayed a handgun.  Did
21  I read that correctly?
22  A    Yeah, you did read it correctly, but as they were -- they
23  gave foot pursuit of Mr. Modacure but he had the gun in his
24  hand while he was running away from the officers.
25  Q    Okay.  I'm going to go back.  There are some statements
```

```
1   that say that he made a foot pursuit.  On here, this crime
2   scene report of what they were told, does it say there that he
3   pulled a weapon in a foot pursuit or as they approached him?
4   A   Said he displayed a handgun.
5   Q   How do you display a handgun?
6   A   You make it visible.
7   Q   So they said as he approached them -- and they said they
8   approached him on Fontaine Street.  Right?  Didn't you just
9   tell the court that they said they approached him to pat him
10  down and he --
11  A   No, I did not say that.  Sergeant Hampton was speaking with
12  Mr. Modacure.  He would attempt to walk away and she would
13  direct him to come back and he would.  And Officer Short saw
14  the outline of a handgun protruding against his shirt, made
15  aware -- made Sergeant Hampton aware of that and she said she
16  was going to try to pat him down, and that's when he started
17  running.
18  Q   Let me read you this.  Officer Johnson advised while
19  Officer Short and Officer Smith --
20          THE COURT:  Slow down.
21  BY MR. SWEET:
22  Q   -- were canvassing the area, they noticed a black male they
23  identified as Devon Modacure who fit the description of the
24  suspect who fired shots at Mr. Bishop on Memphis Street two
25  streets south of Lampton.  Officer Johnson advised as Officer
```

1    Short and Smith approached Mr. Modacure he displayed a handgun.

2    A   Officer Johnson has a report in here, so this would be

3    Officer Harris' account of speaking with Officer Johnson.   We

4    can refer to her report.

5    Q   What you're giving the court is an account of what Short

6    told you.   Right?

7    A   Right.

8    Q   And this report is an account of what they told this

9    officer.   Isn't that right?

10   A   This is a report of what Officer Harris perceived from the

11   officers.   I wasn't there.   I don't know what was said to who.

12   Q   How do you perceive a report?   In other words, somebody

13   tells you something and he wrote it in his report?

14   A   I understand, and there is several, like, address mistakes,

15   so I mean that's why I went to Officer Short.   He was there the

16   entire event and I deferred to his account.

17   Q   Agent, I know you defer to his account.   I'm just simply

18   saying this account that's in the official police report says

19   that when they initially --

20   A   I agree with you that's what it says.

21   Q   He pulled a weapon on them.

22   A   Displayed, I believe.

23   Q   He displayed it.   He wasn't trying to sell it.   When you

24   display it, that means he pulled it out.   Correct?

25   A   He did pull it out.   While running from the scene, he

1    pulled the weapon as he was running.

2    Q    That's what Short told you in your interview?

3    A    That's correct.

4    Q    I'm talking what he told this person in this interview.

5    A    He did not speak to Harrison in that part of the report.

6    That's Officer Johnson, I believe.

7    Q    Have you talked to Harris?

8    A    No.

9    Q    Did you talk to him about this statement in there?

10   A    I did not.

11   Q    So you're just speculating about what Harrison said?

12   A    Said Officer Johnson advised is the very last line.

13   Q    All right.  Let's just go -- let me see that.  They said

14   they shot him multiple times.  Right?

15   A    That's what it said.  To my knowledge, he was only hit

16   once.

17   Q    Where did they shoot him?

18   A    I believe it's in the back.

19   Q    Okay.  So let me just -- I showed you one report there

20   where they said he pulled a gun when they approached him.

21   Another time they told you that he ran toward 33 whatever the

22   address, stopped, turned around and aimed a gun at them.

23   Didn't they?

24   A    I believe that's what it said.

25   Q    Then they said when he stopped, turned around and aimed a

1    gun at them, he shot him.  Right?

2    A    That's what it said.

3    Q    One of the officers shot once and the other shot twice.

4    Right?

5    A    Correct.

6    Q    Hitting him multiple times?

7    A    Correct.

8    Q    Have you looked at the medical records?

9    A    No.

10             MR. SWEET:  May I approach, Your Honor?

11             THE COURT:  You may.

12   BY MR. SWEET:

13   Q    Read to the court in the medical records where they say he

14   was shot.

15   A    The highlighted?

16   Q    Highlighted part.

17   A    20-year-old male presents to the ER after he was shot in

18   his back.

19   Q    Shot where?

20   A    In his back.  Patient refuses to speak.  He is awake and

21   nodded his head to questions.

22   Q    He read the report.

23             MR. SWEET:  May I approach, Your Honor?

24             THE COURT:  You may.

25   BY MR. SWEET:

1    Q    Read to the court where it says --

2              MR. MCGLOTHIN:   Your Honor, I'm going to object at

3    this point.   We are here for purposes of detention as it

4    relates to a felon in possession charge.   We are not here to

5    try the circumstances surrounding this shooting of the

6    defendant.   We are here -- the federal government has only

7    charged this defendant with being a felon in possession of a

8    firearm.   As to who was shot and where they were shot, I think

9    to go into that with this witness is completely irrelevant to

10   the charges as to why we are here today.

11             THE COURT:   Why is it relevant?

12             MR. SWEET:   Your Honor, I'm going to show the video

13   again where he doesn't have a firearm.   I think the statements

14   go to the officer's credibility.   Your Honor, the officers have

15   inconsistent statements throughout their reports about how this

16   occurred.   My last question is where the gun came from.   The

17   video where he didn't have a weapon.   And I think it goes to

18   the strength of the case of the felon in possession of a

19   firearm, Your Honor.

20             THE COURT:   I'm going to give you some latitude but

21   I'm not interested in hearing an attack on the exact shooting.

22   I just want to know what bearing it has on the charge that is

23   here before this court.

24             MR. SWEET:   Your Honor, what I was attempting to show

25   is that the video -- if the court looks at the video, he does

1    not have a weapon in his hand, he does not have a weapon in his

2    waist.  He is in a full sprint forward when he is shot.

3           The officers say that he stopped at the beginning of

4    that carport, turned with the weapon, aimed it at them and

5    fired.  We can show that that just didn't occur.  If he didn't

6    have a weapon then and turned and fire --

7           THE COURT:  At what point are the officers saying he

8    turned and fired?

9           MR. SWEET:  At the carport.

10          THE COURT:  Ask the witness.

11   BY MR. SWEET:

12   Q   So he was at the Fontaine Street address.  Right?

13   A   Yes, sir.

14   Q   He came across the path.  Right?

15   A   Sir?

16   Q   He crossed the street --

17          MR. MCGLOTHIN:  And, Your Honor, I'm going to object.

18   This is Mr. Sweet's witness so he has him on direct

19   examination.  He should not be leading the witness.

20          MR. SWEET:  Your Honor, he is adverse.  He is the

21   investigating agent against my client.

22          THE COURT:  Go ahead.

23   BY MR. SWEET:

24   Q   I will put it up so you can see.  This is the carport.

25   Correct?

```
1    A    Correct.

2    Q    And this diagram, you see the white car would be the path.

3    Right?

4    A    From which he was coming, yes.

5    Q    From which he was coming.  So they said he came through the

6    path over here.  Correct?

7    A    Correct.

8    Q    And as he got to the address over here where this carport

9    is and these bushes, he stopped, turned and aimed the gun at

10   them.  Correct?

11   A    I believe a report does say that, but --

12   Q    I understand.  They said he stopped, turned and aimed a gun

13   at them right there.  Correct?

14   A    I believe the report says that.

15   Q    And then they shot him multiple times and dropped him.

16   Correct?

17   A    According to the report, yes.

18   Q    Okay.  However, we know from the video that that's not

19   correct.  That's not true.  Is it?

20   A    No, it's not.  Not according to my interview Friday.

21   Q    All right.  So at that point they said they stopped, he

22   aimed and they dropped him --

23   A    It's very similar to the account from Friday but not

24   exactly, not specific, no.

25   Q    So from the point here where they say that he pulled a
```

1    weapon, aimed it and they dropped him --

2    A    No, he was carrying the weapon through the foot chase.

3    Q    And this foot chase went right over here and he was dropped

4    over here by the garage.   Correct?

5    A    Correct.

6    Q    So in this chase here, when they shot him, he should have

7    had a weapon?

8    A    Yes.

9    Q    So if the video shows it, you should see a weapon in the

10   video?

11   A    If it's a clear enough video, yes.

12          MR. SWEET:   Play it.

13   BY MR. SWEET:

14   Q    You saw the video more than --

15          MR. SWEET:   I can't play it, Your Honor.   I don't have

16   my Hot Spot.

17          THE COURT:   Well, you can ask the questions.   I

18   remember the video.

19   BY MR. SWEET:

20   Q    You saw the video?

21   A    Yes.

22   Q    You did not see a weapon in the video.   Did you?

23   A    I couldn't make one out, no.

24   Q    Did you all do a trace on this weapon, where it came from?

25   A    Yes.

```
1    Q    Tell the court where this weapon came from.

2    A    It was traced to a law enforcement agency I believe in

3    Illinois.

4    Q    The Illinois State Police?

5    A    Yes.

6    Q    The weapon came from the Illinois State Police?

7    A    Originally.  It's original purchase from the manufacturer.

8              THE COURT:  Where did the firearm come from?

9              MR. SWEET:  Illinois State Police.

10             THE WITNESS:  It was sold to the Illinois State Police

11   in --

12             THE COURT:  Was it recovered at the scene?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Okay.  Where was it recovered?

15             THE WITNESS:  After Mr. Modacure was shot, he was

16   placed in handcuffs.  When they rolled him over, it was

17   underneath his body and it was removed towards the trashcan at

18   the corner of the carport.

19             THE COURT:  Say that again now.  You --

20             THE WITNESS:  When he was shot, he went to the ground.

21   Officers handcuffed him.  And as he was on his stomach,

22   handcuffed him.  And when they were flipping him over to search

23   him for other weapons, this Glock .22 was found underneath him

24   around his body area.  And it was immediately moved, picked up

25   or kicked away from his immediate proximity.  And the gun was
```

1    recovered in the -- do you have a photograph of the trashcans?

2              THE COURT:  Who kicked it away?

3              THE WITNESS:  One of the officers did.  I don't know

4    which one.

5              THE COURT:  Had the gun been fired?

6              THE WITNESS:  No, sir, not to my knowledge.  I don't

7    believe he ever fired a round.

8              THE COURT:  And how many rounds were in that weapon?

9              THE WITNESS:  I believe the report says there were 14

10   rounds recovered from the crime scene, I am not sure exactly

11   how they determined what, but there were three or four live

12   .40-caliber rounds recovered, like, from the ground or from the

13   scene that would not have been in the magazine of the gun, but

14   I don't know why they wouldn't have been in the magazine.

15             THE COURT:  I don't understand.  If they had not been

16   fired --

17             THE WITNESS:  They had not been fired.  The complete

18   unfired rounds, it was either three or four of them were picked

19   up off the ground from that area as well with the gun.

20             THE COURT:  And how many were in the magazine?

21             THE WITNESS:  There were 14 rounds totally taken from

22   the scene.  I don't know how many were in the mag or if it was

23   14 minus the three that were on the ground.  I don't know.  It

24   was a total of 14 .40-caliber rounds, and that was the only

25   .40-caliber on the scene.

1          THE COURT:  You said 14 were recovered.

2          THE WITNESS:  Yes, sir.  The officers carried

3  9-millimeter guns.

4          THE COURT:  And so you don't know whether the three

5  that were recovered on the ground belonged to that magazine.

6          THE WITNESS:  No, sir, I can't say that it was.

7          THE COURT:  You say the magazine would hold a total of

8  14?

9          THE WITNESS:  Or more.  I believe 15.  I believe it

10 will hold 15, but I'm not sure.  I believe it's 15.

11         THE COURT:  Okay.  Mr. Sweet, go ahead.

12 BY MR. SWEET:

13 Q   I'm looking for the report here.  They also said they found

14 a package with rounds in it.  Didn't they?

15 A   I don't see that.

16 Q   Do you know if any rounds were even in the gun?

17 A   I can't speak that they were.

18 Q   I want to find out exactly who told you that the gun was

19 under him when they rolled him over, they kicked it out from

20 under him.

21 A   Officer Short.

22 Q   That's what he told you?

23 A   That's what he told me, that the gun was under him and that

24 when they rolled him over, he didn't say he kicked it out from

25 under him but someone there did, one of the other officers.

1           MR. SWEET:  May I approach, Your Honor?

2           THE COURT:  You may.

3   A   Yes, sir.

4   BY MR. SWEET:

5   Q   Read right here what Johnson said he saw.

6   A   *I observed black male wearing a maroon shirt, blue shorts*

7   *and something running shoes -- something shoes running with a*

8   *handgun in his right and towards the driveway of 3361 Fontaine*

9   *Avenue.  I observed Officer Short and Officer Smith running*

10  *behind the suspect later identified as Devon Edward Modacure,*

11  *Jr.  The suspect, Devon, continued to run towards the carport*

12  *and then he started to turn around aiming the weapon in the*

13  *direction of the officers.*

14          THE COURT REPORTER:  I'm sorry.  Slow down.

15  A   *Turned around aiming the weapon in the direction of the*

16  *officers.  I, Officer Johnson, observed and heard two shots*

17  *fired and noticed the subject drop to the ground and the gun*

18  *flew next to the garbage can.*

19  Q   Read that again.  The gun did what?

20  A   Flew next to the garbage can.

21  Q   I've got another officer says that the gun flew next to the

22  garbage can.  Here is another one.  Read that highlighted part.

23  A   That's the same officer.

24  Q   I will just go with that officer.  Johnson says the gun

25  flew over by the garbage can, they found it by the garbage can.

1    Right?

2    A    That's correct.

3    Q    And Short says the gun was under him and when they rolled

4    him over they kicked it?

5    A    That's correct.

6    Q    They are not even consistent on where the gun was located?

7    A    No.

8    Q    Did you know that the eyewitnesses out there said they saw

9    an officer with the gun in the street?

10   A    No, sir.

11   Q    They said, *Here is the gun.*  When I showed you the

12   videotape, didn't I show you officers leaving and coming back?

13   A    I don't recall.

14   Q    Let's play it.

15        MR. SWEET:  We can play it now, Your Honor, if we can.

16        THE COURT:  What are you going to show?

17        MR. SWEET:  I'm going to show him being shot and then

18   the officers leaving and coming back.

19        THE COURT:  Okay.

20        MR. SWEET:  Don't worry about it.  Let me just

21   summarize in this way.

22   BY MR. SWEET:

23   Q    Did you see any photographs on the crime scene

24   investigation where they photographed the location of the gun?

25   A    I did.

1    Q    You didn't?

2    A    I did see photographs.

3    Q    Of the gun?

4    A    Yes.

5    Q    Did you see them where they recovered it from?

6    A    I believe it's next to the garbage can.

7    Q    Do you have a photograph of that?

8    A    I don't have it with me, no, but I believe I have seen a

9    photograph of the gun near the garbage cans.

10   Q    So it's inconsistent with where the gun was recovered from.

11   Right?

12   A    No, sir.  You talking about where it was taken as evidence?

13   Q    Two officers' statements are inconsistent where the gun was

14   recovered.

15   A    Thrown to or kicked to.  I think they all agree it was near

16   the garbage can.

17   Q    Well, one of them said when he fell it was thrown to the

18   garbage can.

19   A    Right.

20   Q    One said it fell under him and they rolled him over and it

21   was kicked to the garbage can.  That's not consistent.

22   Correct?

23   A    That is not consistent, you are correct.

24   Q    All right.  The video shows him running.  It doesn't appear

25   he has a gun in his hand.  Does it?

1    A    I couldn't determine that.

2            THE COURT:   I think we have gone over that already.

3    BY MR. SWEET:

4    Q    It is not consistent that they say he turned, aimed a gun

5    at them and they shot him and dropped him when the gunshot

6    wounds are in his back.

7    A    Correct.

8    Q    That's not consistent with the story.   Correct?

9    A    What do you mean?

10   Q    If he turned and aimed a gun at them, the bullets when he

11   was shot would not be in his back?

12   A    Officer Short has since said that he was turning towards

13   them with the gun and that's when they fired.

14   Q    You told Officer Short when you interviewed him that we had

15   a video?

16   A    I did.

17   Q    He didn't know you had a video before?

18   A    I don't have a video.

19   Q    He didn't know there was a video before the second

20   interview?

21   A    I don't know what he knew.   The cameras are plainly

22   visible.

23   Q    You saw the statements he gave before you told him you had

24   a video, and he said --

25   A    I have not seen his statement.   I have seen other people

1    document his statement, but I can't say that he has signed off

2    on it.  He has expressed certain parts of these statements were

3    not as he intended it to be.

4    Q   Every statement you had that you saw before, every officer,

5    and I have looked through several of them was he stopped,

6    turned and aimed a gun at them and they fired multiple times

7    hitting him.  Right?

8    A   That's what the reports say, yes.

9    Q   You interviewed him, said, Hey, they have got a video, and

10   it doesn't show him turn, aim the gun and you shot him.

11          MR. MCGLOTHIN:  I'm going to object to that line of

12   questioning, Your Honor.  One, I think the witness has already

13   stated that that's not something that he --

14          THE COURT:  You are just repeating questions now.

15          MR. SWEET:  No further questions, Your Honor.

16          THE COURT:  Okay.  Questions?

17                     **DIRECT EXAMINATION**

18   BY MR. MCGLOTHIN:

19   Q   Agent Parten, you were asked several questions, and you

20   recall seeing the video.  Is that correct?

21   A   Yes, sir.

22   Q   When you went to the scene -- recently went to the scene,

23   how many cameras are at that house?

24   A   I saw three.

25   Q   And how many -- and the video camera that was shown to you

1    and to the court at the previous hearing and to this court

2    today, based on what you saw and the position that you saw the

3    cameras, is that the best camera to catch what took place?

4    A    If all the cameras are working, no, it's not.

5    Q    Okay.  Is there a camera that's pointing directly down in

6    the direction which he was running?

7    A    There appears to be, yes.

8    Q    How many angles have you seen and how many angles have been

9    shown to the court?

10   A    I believe just the one.

11   Q    Did you attempt to get those cameras or those -- the video

12   footage?

13   A    I spoke with the gentleman at the house who advised that

14   his girlfriend is in charge of that or maintained all of that,

15   provided the recordings for the defense attorney, and I left a

16   number for her to call me, and I have not heard back.

17   Q    So the efforts to obtain all three angles of the video have

18   not proved to be successful?

19   A    That's correct.

20   Q    Do you recall in the last hearing as well that was your

21   first time being shown the video?  Is that correct?

22   A    That is correct.

23   Q    And you were asked and questioned about the video and the

24   fact that the officers said that this person had on a burgundy

25   shirt -- that the defendant had on a burgundy shirt and that's

1    why they stopped and questioned him?  Do you recall that?

2    A    Correct.

3    Q    And you were asked what color the shirt was before the

4    magistrate judge, and do you recall being hounded about or

5    continuously questioned about the color of that shirt?

6    A    Yes, sir.

7    Q    And I think your response at that time was based on the

8    camera that you saw, the shirt appeared to be purple or green.

9    Is that correct?

10   A    Correct.

11   Q    And I think defense counsel said that's not a burgundy

12   shirt so you would have had no reason -- they would have had no

13   reason to stop and question him?

14   A    That is correct.

15   Q    Since that time, have you had an opportunity to go to

16   Jackson Police Department and to obtain some additional photos?

17   A    No, I actually had a disc with -- I already had the

18   photographs on it.

19   Q    You had a disc with the photos on it already?

20   A    Yes, sir.

21        MR. MCGLOTHIN:  Adam, if I could?

22   (SHORT PAUSE)

23   BY MR. MCGLOTHIN:

24   Q    Officer Parten, is -- Agent Parten, is this the photo of

25   the defendant on the day in which this incident took place?

```
1    A    It is.
2    Q    And what color is that shirt that he has on?
3    A    It appears to be a reddish maroon color.
4    Q    And did that shirt line up -- did it match the description
5    of the shirt given by the victim who had been shot?
6    A    Yes, sir.
7    Q    And so although on the video camera the shirt may have
8    looked purple or green or whatever color --
9    A    It appeared to be bright green on the camera from the last
10   hearing.
11   Q    And, again, those cameras are black and white cameras.
12   Correct?  What we have seen was black and white.
13   A    They appeared to be.  The officers' uniforms were kind of a
14   green color as well, and I know they had black on.
15   Q    Okay.  And so this picture here is an accurate depiction of
16   what the defendant looked like on that date and at that time?
17   A    It is.
18   Q    Was a firearm recovered on October 27, 2017?
19   A    It was.
20   Q    And did the officers identify this defendant, Devon
21   Modacure, as the individual who possessed that firearm at that
22   time?
23   A    They did.
24   Q    What type of weapon do the Jackson Police Department
25   officers who were carrying that day, what type of weapons do
```

1   they have?

2   A    Glock 9-millimeter pistols.

3   Q    And what type of weapon was recovered from this defendant?

4   A    A Glock 40-caliber pistol.

5        MR. MCGLOTHIN:   Your Honor, no further question from

6   the government.

7        THE COURT:   Okay.

8                    RECROSS EXAMINATION

9   BY MR. SWEET:

10  Q    Okay.  You keep saying he fit the description of the

11  suspect.  Where is the description of the suspect?  There was a

12  shooting at 11:00.  Right?

13  A    I don't know exactly what time it was.

14  Q    Okay.  This was four hours after that shooting.  Four hours

15  after the shooting.  Right?

16  A    I don't know.

17  Q    You say he fit a description.  Where in that -- tell me a

18  description of the first person who did the shooting, this guy

19  named Gator.  We know it's not Devon Modacure.  Where is a

20  description anywhere in the reports of the person who did the

21  shooting?

22  A    In Sergeant Hampton's report, she writes that Officers

23  Short, Smith, Johnson and Hampton traveled to the location,

24  made contact with a person of interest that was wearing a

25  maroon T-shirt as described by Christopher Dishman who had been

```
1    shot at the other location.

2    Q    That's the description of a maroon T-shirt four hours

3    later?

4    A    Sir?

5    Q    Maroon T-shirt?

6    A    That's what's in this report, yes.

7    Q    And didn't someone say he had shorts on?

8    A    I believe not a description of the subject but I think

9    Officer Johnson may have said that.

10   Q    That somebody had shorts on?

11   A    Officer Johnson said that she observed a black male wearing

12   a maroon shirt, blue shorts and --

13   Q    Blue shorts?

14   A    Maroon shoes running with a handgun in his right hand

15   towards the driveway of 3361 Fontaine.

16   Q    We know he didn't have blue shorts on.  We saw the picture

17   of him.  He didn't have blue shorts on, Devon Modacure.

18   A    I believe not, yeah.

19   Q    Okay.  So whether that's a -- I mean --

20   A    That wasn't a description of the suspect.  That was what

21   she seen that the officers were pursuing.  I don't think there

22   is any question as the person she is seeing being a different

23   person than the person that the officers engaged on Memphis

24   Street.

25   Q    Okay.  She said she saw somebody in a maroon shirt with
```

```
1   blue shorts on running.

2   A    Yes.

3   Q    That was not Devon Modacure?

4   A    The person that she saw was Devon Modacure.

5   Q    With the blue shorts on?

6   A    No, the individual running.  Whether he had shorts on or

7   not, it was Mr. Modacure.

8              MR. SWEET:  I have nothing further.

9              THE COURT:  You can step down.  Any other witnesses?

10             MR. SWEET:  No, Your Honor.
```

```
 1                       CERTIFICATE OF REPORTER

 2

 3          I, BRENDA D. WOLVERTON, Official Court Reporter, United

 4   States District Court, Southern District of

 5   Mississippi, do hereby certify that the above and foregoing

 6   pages contain a full, true and correct transcript of the

 7   proceedings had in the aforenamed case at the time and

 8   place indicated, which proceedings were recorded by me to

 9   the best of my skill and ability.

10          I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13          This the 24th day of August, 2018.

14

15                         s/ Brenda D. Wolverton
                           U.S. DISTRICT COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```